## (January 31, 1972)

■ YONKERS URBAN RENEWAL AGENCY, Appellant, v. MURRAY FIELDS et al., Respondents.— Memorandum. In a condemnation proceeding, petitioner appeals from an order and judgment (one paper) of the Supreme Court, Westchester County, dated February 23, 1971, which *inter alia* confirmed the report of the Commissioners of Appraisal. Order and judgment affirmed, with one bill of costs to respondents Fields and Grossman. No opinion. Benjamin, J. (dissenting). Once again we are faced with the vexatious problem of a grossly excessive award by commissioners which, under the archaic Condemnation Law, we cannot modify but can only reject. Had this award been made by the court, we could reduce it to the proper amount and end the litigation here and now if we find it excessive; but because it was made by commissioners we cannot do that and, if the award be excessive, we must, instead, needlessly prolong the litigation by rejecting the award *in toto* and requiring new hearings before the same or different commissioners. Now, what are the facts in this case? The subject property was a 41-year-old, run-of-the-mill warehouse in a depressed area in Yonkers that is now being condemned for a slum clearance project. The building contains about 35,000 square feet of warehouse space and about 5,000 square feet of office space. In 1956 the owner leased the property for about $30,000 a year gross (about 75 cents a square foot), with the owner paying the taxes; the net to the owner was less than $20,000 a year.

In 1965, four years before the taking, the lease was renewed at the same $30,000 a year, gross, and the tenant was given an option to buy the property for $390,000. These leases were arm's length transactions and the 1965 renewal was in a year when market conditions were highly favorable for owners of industrial properties; it therefore is a compelling indication of the fair rental value of this property. After the lease was renewed in 1965, the tenant installed some plumbing, air conditioning and electricity and made certain tenant changes and improvements which were not attributable to the structure but rather to the special uses by this tenant; these alterations may have added, at most, $200,000 to the value of the property. Thereafter the tenant exercised its option and bought the property for $390,000; adding to this purchase price of $390,000 the $200,000 added to the value of the building by the improvements, other than purely tenant changes, made by the tenant (now owner) before it bought the property, the owner's cost became about $600,000. Using the summation method (reproduction cost, less depreciation) and utilizing the judgment and experience that commissioners may employ (*City of Binghamton* v. *Koffman,* 28 A D 2d 1071), it is clear that an outside figure of $15 a square foot would be an extravagant estimate of the reproduction cost of this stereotyped warehouse; as this building has about 40,000 square feet of space, its reproduction cost would be about $600,000. No matter how sound it may appear to be, we must, in good conscience, allow at least 1% a year depreciation on this 41-year-old building; hence, the depreciated reproduction cost is about $350,000. Accepting both parties' estimate of the land value as about $200,000, the result is a value of $550,000 by the summation method—a figure less than the compassionate appraisal of $600,000 by appellant's expert. With respect to the market value approach (sales of comparables), the owner's expert would have us exclude comparables from consideration on the ground that no fair comparables are available. I agree only to the extent that it would be impossible to find any that even remotely approach the extraordinary value ($935,000) that he placed on this ordinary 41-year-old warehouse. Now let us examine this case in light of the capitalization method, which is the most appropriate approach to value in a case like this and which was the method exclusively relied on by the commissioners. The record shows that in 1966 the tenant under the 1965 lease exercised its purchase option and bought this property for $390,000 in the name of another corporation. At about the same time, the purchasing corporation leased the property to another corporation controlled by the same principals as those who controlled the lessor; the lease concededly was not an arm's length one, but instead was an internal arrangement between two interlocking corporations. This lease ran for 15 years; the rental was $82,000 a year, net — about $2 a square foot. The commissioners based their "indicated value" of $882,400 on a capitalization of the $82,000 a year net rental provided in this lease, using a split capitalization rate of 10% on the building and 7% on the land; they ignored the $30,000 gross rental fixed in the arm's length lease of this very building only one year earlier; and they ignored comparables that showed lower rentals for better buildings. With respect to comparables, the record shows that in October, 1969 Anaconda Wire and Cable Co. leased a better building to Cosmetically Yours, Inc., for 10 years at a gross rental of $1.72 a square foot; as the difference between gross and net in such buildings is about 50 cents a square foot, the net rental for the Anaconda building is about $1.25 a square foot. Yet, in our case, the commissioners accepted $2 a square foot, net, as the fair rental value of an inferior building located in a slum, solely because of an intracorporate lease which fixed an exorbitant rental solely because of undisclosed tax or other financial benefits to the stockholders who

controlled both the lessor and the lessee corporations. If we use the Anaconda lease figure of $1.25 a square foot, net, as the fair rental value of our building, the rental value of the property would be $50,000; if we use the Urban Renewal Agency expert's figure of $1.50 a square foot, net, the rental value of the property would be $60,000. And, as an indication of how overgenerous those figures would be, this property was actually leased, at arm's length, for only $30,000 a year, gross — 75 cents a square foot — only a year earlier! Using the Urban Renewal Agency expert's figures of $1.50 a square foot and $60,000, net, for the entire property, and capitalizing it at an overall rate of 10% (which may well be too low a percentage in view of the high interest rates available on bonds and mortgages at the time of this taking), we again arrive at a value of $600,000 for the land and building. And, as above noted, the Urban Renewal Agency expert's estimate of fair rental value was actually much higher than was warranted in this case. Much is made of the circumstance that appellant did not use a prior appraisal of $700,000 given it by a noncalled appraiser. I see nothing sinister in this. The condemnor's counsel have a duty to guard their client against out-of-line appraisals by a prospective witness who misjudged the value of the property because of error, or perhaps incompetency. And, strangely, even this nonused appraisal was about $200,000 less than the amount awarded by the commissioners, who relied solely on a lease made between the owner's right and left hands for a special purpose not germane to the property's value. With respect to the additional allowance of $44,250 to respondents Fields and Grossman for the conduct of this proceeding, I see nothing here that justifies it. This was a very ordinary property, no different from many, many others in the area. They are merely garage-type structures, with some special installations for their tenants, used as warehouses or distribution centers. Their values are as well-known as the price of a loaf of bread; the trial was a routine one and the preparation for it consisted basically of the hiring of appraisers and the presentation of their testimony. The trial took longer than it should have, but that is not a reason to burden the taxpayers with an additional allowance to the property owners on top of an exorbitant award for their property. In sum: I consider this award shockingly excessive — at least 50% higher than the true value of the property. It is true that commissioners have very broad powers in determining value. And it is also true that the Legislature has not yet seen fit to confer on the courts the power to modify a grossly excessive award by commissioners except in New York City watershed cases. But commissioners' awards are not totally insulated from judicial review. When, as in this case, we are confronted with a shockingly excessive award that flies in the face of common sense and experience, we can and should reject it and require a rehearing, *de novo,* possibly before different commissioners. For these reasons I dissent and vote to reverse and reject the commissioners' report.

Hopkins, Acting P. J., Gulotta and Brennan, JJ., concur in memorandum; Benjamin, J., dissents and votes to reverse the order and judgment and to disaffirm the commissioners' report, with an opinion, in which Christ, J., concurs. Order and judgment affirmed, etc.